Good morning. We'll hear the first case, Batchelor v. Interactive Brokers. Good morning, Your Honors. May it please the Court, my name is William Bloss. I represent the plaintiff appellant, Robert Batchelor, in this matter. Your Honors, if a margin account is deficient, that is, it doesn't have enough assets to provide adequate security, then we agree that Interactive Brokers has the right to liquidate assets in order to provide more security. In this case, that means to purchase contracts or positions to reduce the risk using the plaintiff's assets. The reason that the broker asks the customer for that power is to, quote, cover the margin deficiency. That's what their disclosure of risks accompanying their contract says. Interactive Brokers agrees that that's the purpose in their contemporaneous 10-K filings to the SEC. They specifically describe the purpose of that liquidation provision and specifically the reason they use auto-liquidation software. What about, if you could help me understand the import of paragraph 11-D1 of the customer agreement, which says, and I quote, this is on the joint appendix at 79, if at any time customer's account has insufficient equity to meet margin requirements or is in deficit, I.B. has the right in its sole discretion to liquidate all or any part of customer's positions in any of the customer's I.B. accounts at any time and in any manner and through any market or dealer without prior notice or margin call to customer. Doesn't that suggest that Interactive Brokers has discretion to liquidate margin accounts in any manner that it deems appropriate in the event of a margin deficiency? Well, they didn't use discretion here, Your Honor. They used an auto-liquidation software. And I would say that that paragraph has to be read in the context of Appendix 88, which is the disclosure of the risks of margin trading, which says that the purpose of that provision is to, quote, cover the margin deficiency. So what we allege here, Your Honors, and I think that the evidence, and remembering that this is at a motion-to-dismiss stage. We haven't had discovery. We haven't been able to flesh out exactly what the evidence in support of the claims would be. But here's what we know, Your Honor. Before you depart from that, I just want to be sure I understand your response to the Chief Judge's question. The language in the text he'd read to you says that if something happens, margin deficiency, then what they're permitted to do is to liquidate all or any part of the customer's positions. It doesn't qualify that liquidate all right by liquidate all to the extent it's necessary to cover the margin or whatever you're indicating. It says liquidate all. And I only focus on that because, of course, the first principle of contract interpretation is to look to whether the language is clear. You want us to look at something else to identify a limitation. But am I right that there's no limitation in the contract text? Well, actually, Your Honor, the disclosure that I was just quoting at Appendix 88 is actually referenced in that same page of the contract under Paragraph 11A, where it says the customer represents that he has read the disclosure of risks of margin trading. Right, but there's nothing in the D discussion of what their rights are when margin deficiencies arise that indicates it's limited, right? Well, it's limited under any circumstances by the duty of commercial reasonableness, Your Honor. Okay. And the language says what it says. But I think it's important that in this case that we look at really what happened. And, again, recognizing that we're at a motion to dismiss stage. We added to the first amended complaint a chart of what the trades were in this particular situation. And that's at Appendix page 258. Effectively, Your Honors, what happened in this case is that there were two markets for the product, the commodity, the contracts that Interactive Brokers was buying under the terms of this contract, the agreement with the customer. And the fact is, Your Honors, that almost every transaction, all but one, was that Interactive Brokers consummated was because it was at a price significantly higher than the third-party market. And I think that the one startling example of that is that for a commodity that was trading around between $5 and $6, it had practically no volatility, 1% volatility, during the 20 minutes that we're talking about, for any third-party buyer, any open market buyer, not called Interactive Brokers. That may prompt a question of something I don't understand. Where were the trades affected? I thought the trades at issue here were affected on the open market. They were on an open market, Your Honor, but the commodity is relatively illiquid. It's not like Ford Motor Company shares. There isn't going to be a willing seller at a $6 price every millisecond. But there will be willing sellers at some price. For example, Your Honor, this is one of the problems with the software that was used to do this liquidation. It didn't recognize that the liquidity of this market or this product is not the same as it would be for a common share of, say, a Fortune 500 company. They're a limited number of people. Is the crux of your complaint that they used this computer program rather than having, what, a human being place each order or place each sale? No, they can use the program, Your Honor, but this program had flaws in it. This program didn't react. This program didn't have caps. It didn't have floors. This program placed a market order. And that resulted in one seller, that resulted in interactive brokers buying from one seller a commodity for $83. Are you alleging fraud? Not fraud, Your Honor. We're alleging negligence and lack of commercial reasonableness. How does lack of commercial reasonableness apply to this case? Does it come in through the UCC? That's one place, Your Honor. It does come in through Article 9. If the UCC applies to this, which I think is doubtful. Well, I think there are cases in this circuit and there are cases in other circuits that say it does apply to this type of trade. What about Levitin v. Payne Weber? Doesn't that squarely preclude the argument that Article 9 governs margin accounts? No, I think that the Kaplan v. First Options case decides that, and also the language of the UCC in Connecticut expressly says in Comment 8 that it applies to these types of commodities. Could you address Levitin v. Payne Weber? I think Levitin really was focused more on the federal preemption argument, Your Honor. And I should, in answering Judge Sachs' question also, there's also an implied duty of commercial reasonableness not only under the UCC but also under the common law. What happened here, Your Honors, is that this company, Interactive, bought effectively due to a software flaw, without a cap and without a floor, and without recognizing changes in the volatility of the market, changes in the willing sellers, effectively created a second market where it paid prices that were up to 1,500 percent higher than any other third-party transaction for this commodity. Under their view of this, because that was done by — that's what the evidence is, Your Honor. That's what the allegations and the complaint are, that there was a transaction where at $83, where they bought the commodity at $83, and every other person on earth during that 20-minute period paid between $5 and $6. And the rest of the transactions, Your Honor, were also above in the $6 to $10 range because the software did not recognize the relative illiquidity of this particular product. So it's not — commercial reasonableness, a human being would not have made that $83 trade. Fair enough. But we start still with the question of whether commercial reasonableness is a standard that applies to this case in these facts. There is a — well, and I think that this Court has said that in liquidating a margin account, that there are two protections for customers. One is bad faith. We don't allege that. But the other is commercial reasonableness. And the standard is in the disjunctive. It's not bad faith and commercial reasonableness. What are you quoting? If you'll give me a second, Your Honor, I — Well, you can tell me on your level. I can do that. I'll — Am I to understand that the problem was the lack of floors and ceilings? That was one of the problems. What else? The other problem was that the software determined what the market was. And again, we're at the motion to dismiss stage. Just finish the sentence. I mean, you're now divergent. Didn't determine what the market was in what respect? The software determined what the market was for the first trade. And then it just assumed that that was the market for the rest of the trades. And so it wound up doing — it didn't react to the relative illiquidity of the product, and it didn't react to the fact that sellers were saying, okay, we're going to sell this now at $8 or $10 or $83. The software went back to the first trade. Let me be sure I understand what you want to argue is the defect here. If we — let me ask you to assume, for purposes of my question, that there's no doubt that they were entitled to liquidate all of the holdings. They go into the market and they basically place a sell order without regard to floors or ceilings or changes moment to moment. You're saying they should have put a floor and a ceiling on, and if the market went above or below either, what were they supposed to do? Wait a second. Wait until there's another willing buyer or willing — in this case — But now you said this was a very illiquid market. So would there have been a possibility that the price that's either too high or too low would have gone even higher, even lower? In this circumstance, Your Honor, again, the fact — the pleadings are that it did not. No, I understand that, but you can't ask us to gauge whether they were reasonable in terms of what did happen in the terms of the day. I'm asking you, once a floor or a ceiling was hit, what did — what were they supposed to do? You just said wait. And I said wouldn't waiting risk that the problem would become aggravated rather than mitigated? So what they did, Your Honor, was they traded in a way that actually increased the margin deficiency. That's the base of it, is they shouldn't trade in a way that actually makes a bad situation worse, or what was, in fact, not even a bad situation in this case. They misvalued the margin — the value of the account, but that's a separate issue. What they should do is not make matters worse. They, under their — They've held a fair amount of this product, I mean, relatively speaking. As soon as they start selling, that's going to have an effect on especially a small and illiquid market. And I want to just — And it's not going to be an effect that's favorable to the ongoing sale of your product. That's just reality. Well, actually, according to the trades that we've put in the complaint, the chart that we've put in the complaint, actually there was extremely low volatility for everybody else on earth. There was a 1 percent variance in the price for everybody else on earth. How do you account for that? When you tell us that basically you go into the market and the price is high at this second, how is it that it wasn't high for others at that time? I'm not following what happened. Because this software accepted offers to sell at prices higher than the market. And so, of course, a seller — there was one very clever seller out here. There was one very clever seller that had a standing sell order at $83, which was ridiculous. It was 1,500 times the market price at the time. But Interactive bought it because their software didn't recognize that that was out of line. What their argument means, Your Honor, is that every one of those transactions could have been consummated at $83, 1,500 times greater than the market price, and they would be immune from any liability for that because a computer program made the buy rather than a human being. That is not commercially reasonable. That is not reasonable. You told me a moment ago that it didn't have to be a human being to be commercially reasonable. You weren't pressing that point, right? Absolutely. The problem isn't using software. The problem is using software that allows these kinds of transactions to be consummated that are so far outside the market norm. They could have put a cap on a floor, and they could have coded it to recognize what the market was doing. And I want to just mention, Your Honor, when I say illiquid, I mean relatively illiquid. This is not as liquid as Ford Motor or United Technologies. But it's not — but you can see there are 50 transactions over a 20-minute period. Let me just . . . what it is. It is a put option on the Standard & Poor's 500. It's called a . . . it's a . . . and it's a . . . it's not . . . That's enough. Okay, that's fine. Let me, before you sit down, you've moved for the judge to recuse herself. Yes. But as I understand your arguments, you're not saying that there was any actual impropriety or any conflict of interest. Is that correct? Am I misunderstanding you? I think the base of the argument is, Your Honor, that the judge in, as far as we can tell, factually identical circumstances in 2011, where her husband is the general counsel for a major life insurance company. Her husband had hired a particular firm to represent the insurance company in unrelated matters. Unrelated. The judge issued . . . Sua Sponte, post-trial, issued an order saying . . . asking the law firm to provide information about that representation to the plaintiff's attorney in that case, and then she said that absent a waiver, she would recuse herself. So it was factually . . . We don't know what information was provided in response to that request. It's not in the record, Your Honor. Right. So how can you say that it's analogous? That would be an important factor. I mean, maybe something was disclosed there that prompted the judge to identify a concern that's not present here. Well, she actually said that she didn't say that she would recuse herself depending on what the information was. She said she would recuse herself absent a waiver. So it wasn't what was in the information that caused her to recuse herself. It was a lack of a waiver. And we have a factually . . . You're not suggesting that an actual impropriety exists.  No, Your Honor. But this is one of these situations where there is an appearance where, again, from the point of view of a client, in 2011, she recuses based on her statement that her husband hired the defendant's law firm. So far as we know, that is exactly what happened here. And we did ask for the provision of the similar information, Your Honor, that was ordered in 2011, and that was denied. We were not provided with that information. It's very, very difficult for us, in the context of an appeal of an actual case, to police recusals. Recusals are remarkably complicated. We know this personally, unlike most of the things we talk about. And it's very . . . maybe she changed her mind. Maybe she said, gee, I shouldn't have done that. That was really kind of a stupid thing to do. Well, here, it wasn't a real conflict. So I accept that point of view, but that's not what her order said. Her order didn't say, look, I made a mistake in 2011, or it was a different situation. Her order just said . . . her order acted as if, Your Honor . . . and I say this with respect, obviously. I understand. Her order did not say, look, I think I made a mistake in 2011. I think I didn't need to recuse myself, and I'm not going to do it now. That's not what she said. Her order acted as if the 2011 incident really didn't happen, and it wasn't . . . and it would have been, from a point of view of an appearance of impropriety, I think it would have been appropriate for the court to have said, here's what's different. I was in a different factual situation there. They provided information in that. It may have been better practice, or better in these circumstances. But to do it afterwards, I mean, you wouldn't be complaining and you won in the district court about the fact that she was inconsistent. Well, the difference is, Your Honor, in 2011, she disclosed at sua sponte. We didn't know until after the motion to dismiss had been granted about this 2011 order. It's not a published order. It was in a kind of an odd situation. I don't know if Your Honor saw the notice, but it's issued by the clerk to the parties in that case. It's not a published decision, and it's done not by means of a judicial opinion. And that notice actually, Your Honor . . . That's part of the problem, is that it's a different kind of a problem if it's a problem at all. I'm saying we don't know, and the question is whether she has to explain it to you or to me. Maybe, you know, I've been known, frankly, to say I just don't want to hear that case. I have dinner with that guy once a month, and he pays for his and I pay for mine, but I just don't feel it would be right. I'm not going to explain that to anybody. I'm just going to say I recuse myself. I understand, and that's . . . If Judge Bryant had in 2011 not recused herself under identical circumstances, I don't know that that would be an issue. The problem is, Your Honor, that where she . . . You mean if I heard a case in which he was counseled five years ago, I've got to explain to everybody why I'm recusing now? If, as far as the public record is concerned, a set of circumstances led somebody to recuse themselves five years ago, and then those identical, as far as we can tell, identical circumstances are presented again five years later, then either a recusal or some explanation of why this is different, Your Honor. We've cited some cases, the Ford v. Ford case in Connecticut, as to where there is a trigger for a recusal that absent some change of circumstances, then the same rule should apply. This is a hard thing to explain to a client, Your Honors, frankly, where in 2011 this leads to one result and in 2016 it leads to a different result. Thank you. Thank you, Your Honor. Thank you. Good morning. May it please the Court, I'm Gary Bennett of Deckert LLP, counsel for the appellees herein, including the broker-dealer. This appeal arises out of three district court decisions, dismissing the complaint, denying the motion to amend post-judgment, and then denying the post-judgment motion to recuse Judge Bryant. Mr. Batchelor failed to maintain the minimum account value required to meet his contractual and regulatory requirements for his brokerage account. Pursuant to Federal regulations and the account contract, including provisions 11C and 11D, which the Court focused on during the appellant's presentation, interactive the broker-dealer liquidated the account, meaning that they closed the positions and reduced the account to cash. The complaint is that certain of the liquidating trades had the effect of increasing rather than reducing the margin deficit. And the appellant's position is essentially that on margin default, the broker can properly make liquidation trades only when, in hindsight, doing so would reduce the margin deficit. And, of course, that's always in hindsight, and the cases that are cited by both sides involve situations where, in hindsight, it would have been better for the customer if the broker-dealer had waited, but in some cases they're brought where the broker-dealer, they say, should have liquidated sooner and waited too long to liquidate. So it's only in hindsight that we know that. I understand your arguments on that point. I wanted to ask you this. The district court dismissed the negligence claim as being duplicative of the contract claim, correct? Yes, that's true with respect to interactive brokers, the broker. Right. With respect to the other two defendants. Right, I understand that. Yeah. But under Connecticut law, right, the negligent, I'm quoting from a Connecticut decision, the negligent performance of a contract may give rise to an action in recovery in both tort and breach of contract, correct? There are cases that say that. However, the result there cannot be different than what it would be under the contract. If the contract actually controls the relationship and says what is to happen, that cannot be an inconsistent result. And here the negligence that is alleged, the negligence that they attempt to allege is not adequately alleged. What they are alleging is negligent is essentially that when the liquidation is carried out, there are no floors and there are no caps and there are no other protections in place to prevent the high prices that they deem to be too high. Here the appellant had sold deep out of the money SPX, which is a bundle of stocks, call options. So only if the market really went down would those ever be called. And so it's extremely a liquid position. And so there is no negligence alleged here. What was done was exactly what is done when a broker liquidates positions that are traded on a public market here, the CBOE. They sold them or actually bought in the covering positions on the CBOE. So the courts have repeatedly confirmed that federal margin rules exist for the protection of brokers and the securities markets, not the defaulting margin customer. The purpose of margin call rules is to protect the brokers from the risk associated with insufficiently secured accounts. And applying this principle, many courts, including the Second Circuit in the modern settings case, have consistently rejected customer challenges to the enforcement of margin requirements. And we have a multi-page list of citations in our brief that collect many of the cases in this situation rejecting those types of claims, including cases in the New York State courts, cases in federal court throughout the country, cases in this court. Courts have also rejected attempts to impose upon brokers a duty to liquidate in a manner most beneficial to the customer, whether hindsight indicates that a more rapid liquidation or a delayed liquidation would have been financially preferable. The district court dismissed the negligence claim against Frank because it found that there was no common law duty, right, to develop- Correct. and code and maintain and test liquidation algorithm with the ordinary skill and tests, skill and standards expected of a professional in the industry, I'm quoting. But isn't the proper test for this whether Frank exercised, again under Connecticut law, the degree of care which a skilled professional of ordinary prudence would have exercised under the same or similar conditions? Well, I think that the- Is that the right test that I just quoted? I believe that is the Connecticut test. Yes. But I think the- So why should the claim be, if that is the correct standard, why should the claim be dismissed under that standard? Well, under the problem is, I think, an even more fundamental problem, which is that there is no duty from Mr. Frank, who is the chief information officer at the parent company of the broker-dealer, to customers of the broker-dealer. The customers of the broker-dealer have a contractual counterparty, which is the broker-dealer, and to the extent there is any obligation, it is the broker-dealer's obligation, not the obligation of the chief information officer of the parent company. You know that a large part of the factual plausibility of plaintiff's claims rests on the chart they've pointed to about the differences in the prices that your client executed at and the other market prices, and they do seem to be quite divergent. I mean, why shouldn't that raise some concern about whether this was done either under the contract obligation of, you know, exercising the contract rights in a reasonable way or tort? Why don't-why doesn't that divergent showing create a question? Well, again, our position is that all of these trades were done, and Mr. Bloss conceded this during his presentation and it's conceded elsewhere, on a public market, on an exchange where SPX options and derivatives are traded. As you know from my question, I'm aware of that. But my concern is if they had shown that there were big differences in prices, but your client or your client was subject to some of them and so were others, that would be one thing. But their chart viewed most favorably to them shows that only your client was, again, in their view, foolish enough to execute these trades at the extreme prices when nobody else in the market was doing so. Why doesn't that give plausibility to their claim? Well, the trades that they complain of, some of them were very high, but obviously when the broker is buying in at $83, for example, the broker doesn't know whether the next trade will be up or down. And it's true, of course, that at that point, the interests of the broker and the interests of the customer are somewhat divergent because the broker's interest at this point is to reduce risk, and every closeout of a position reduces risk. And that's what Reg T, you know, sets up and the federal regulations set up, is that in this situation where the account is in margin deficit, the broker is to reduce the risk of the position back to an acceptable level or to zero. Is that an explanation that we can consider on dismissal, or is that one you have to advance later on in litigation in this case? It can be considered on dismissal. All of this information, what the trades were, it's in the record in connection with their motion to amend the complaint, the fact that they were all on the CBOE, and I think that that is dispositive. The judge I understood said that amendments would be futile. Yes. Well, when I look at the joint appendix on 230 and 231, I understand why the initial complaint didn't have enough, but when you look at pages 230 and 231, there seems to be certainly at least questions that suggest that maybe it's not futile. Well, no, I believe that it is still futile because the supposed programming errors that they're identifying are really in the nature of the, they're really recharacterizing the contract claim that they argued on the first, with respect to the first complaint, and now recharacterizing it as a flaw in the liquidation algorithm. But essentially the complaint is that. It's also a negligence. It's a negligence claim. Yes. But the allegation is that the way that the trades are done can result in trades where a buy-in or reduction of the risk in such a way that it increases the margin deficit. But increasing the margin deficit in the context of a liquidation is something that it will happen, it's a routine thing because if the market is extremely volatile and you can have differences between where the position is valued and what the market, when you go to sell it on the market, what the market price is. So I don't think that that solves the problem. I think it's just, on those pages of their complaint, I think they're just, they're simply just recharacterizing the same exact argument, but with some more technical detail. Thank you. One final thing I did want to, unless the Court has questions about the recusal. On Levitin, I did want to address that briefly just to say that, you know, what Levitin says essentially is that the UCC Section 9, which is secured transactions within the UCC, has always existed, coexisted with the federal regulatory scheme without any interference. And all the cases that we cite are along those lines. There's no case where a court has said, you know, if we apply commercial reasonableness to this liquidation, we have a problem with the liquidation. But if we use the federal rules, the federal margin rules, then there's no problem, so we have a conflict and we have to deal with preemption. And Levitin was saying that in 1998, and it's still true today. There's no conflict to resolve here, so you don't get to the preemption issue, I would submit. But that's the answer on Levitin. Thank you. Thank you. Thank you, Your Honors. I'll answer Your Honor's question first. The case I was referring to was the Kaplan v. First Options case, Kaplan Third Circuit case. Same thing, right, to liquidate. Accordingly, the broker's argument. The Second Circuit case? Third Circuit. But the Third Circuit relies significantly on a Second Circuit case, does it? That's correct, yes. And what's the Second Circuit? I don't have it cited in my brief, Your Honor. All right, all right, all right. But I'm not sure. I'm not sure that it correctly, that it fully understands what the Second Circuit said. That is to say, I think there may be a conflict between what the Third Circuit said and what the case, our case, on which the Third Circuit relied. Well, your case, Your Honor, is modern settings, and it looked to whether the provisions of a contract were commercially reasonable. Then the case that the modern settings case relied on was actually an Eighth Circuit case, Gelderman, that examined not only the language of the provision, but also how the provision was implemented. In other words, how it was executed. Because the language itself can be commercially reasonable, but if the execution of the language is not commercially reasonable, then that is actionable. So, and the comment that was just made about this is an extremely volatile market. Well, in fact, that chart, Your Honor, shows that this was not an extremely volatile market. This market for everybody on earth, except for interactive brokers, was not volatile. The prices varied by 1 percent. The prices for interactive brokers varied by up to 1,500 percent. Why? Because of a flaw in their software that allowed them to consummate deals at prices that were double, triple, 1,500 percent greater than the market price. We are asking for the opportunity to do discovery. We are asking for the opportunity to actually see if there is a remedy for this kind of commercially unreasonable behavior that no customer should have to undergo under these circumstances. Thank you, Your Honors. Thank you. Thank you both for your arguments. The Court will reserve decision.